CRAWLEY, Judge.
Kelly M. Morrow (the “worker”), an employee of Dunlop Tire Corporation (the “company”), was injured on March 16, 1996, when her right arm was drawn into a tire-building machine. The injury resulted in a displaced fracture of her right forearm. Because the injury was a crushing injury, the fracture was not simply a clean break in the bones of her forearm, but instead was a break in those bones with accompanying smaller fragments. The worker saw Dr. Louis G. Horn and underwent surgery to repair the arm, which resulted in the reattachment of the bone fragments with plates and screws.
The worker returned to work the first time on April 17, 1996. She attempted to resume her work as a master tire builder, but she could not make the production quota because she had difficulty cutting the rubber. She was later reassigned to a light-duty clerical position.
On April 14, 1997, Dr. Horn performed a second surgery to remove the plates and screws in the worker’s arm. The doctor testified that the areas under the plates and around the screw holes would be weak for approximately six weeks and that the worker was advised to increase the use of her arm gradually over this period of time. According to Dr. Horn, the worker appeared to be making regular progress after the second surgery. She returned to work after this second surgery, on May 12, 1997.
On May 14, the worker tripped and fell while carrying a basket of laundry at her home. She again fractured her right arm. According to Dr. Horn, the fracture was a nondisplaced fracture through one of the screw holes remaining from the prior injury. Dr. Horn placed the worker’s arm in a cast for several weeks, and she returned to work on August 11, 1997. The worker again attempted to resume her work as a master tire builder, but she was again unable to meet production quotas because of the difficulty she had cutting rubber.
The worker testified at trial about the difficulty she had when she attempted to return to work after both the first and the second injury. She testified that her arm would begin hurting and that her wrist would give out when she attempted to cut rubber as part of her duties as a master tire builder. She described the sensations in her arm as numbness and tingling in the top of her hand and on the top of her forearm, stiffness in her wrist, and numbness and stiffness up into her shoulder and neck. The worker also described the effect that the injuries to her arm have had on her everyday activities. She testified that she has tingling pain in her wrist and up her forearm to her elbow when she lifts objects like a gallon of milk or a pot on the stove. She further described the sensation as a pulling or pressure through her arm. She explained that, when lifting items like a pot on the stove, she would have to compensate for the loss of grip strength in her right hand by using her left hand as well.
The worker also explained that her right hand “feels like it’s got extra skin, which I can feel hot and cold, it’s just not as sensitive, I guess, as my left hand. And it’s like your foot being asleep, you know, if you hit it, it’s uncomfortable.” She testified that she could not apply steady pressure with her right hand, like the pressure one would use when using a hand to wash the car or to do gardening. She further said that, whenever she was able to complete a task requiring the application of *1163 pressure with her right hand, her right hand and wrist would be stiff and painful the next day.
The trial court, after hearing the worker’s testimony and then considering the deposition testimony of Dr. Horn, concluded that the worker had suffered a compen-sable injury to her right arm; it awarded the worker benefits according to the schedule in Ala.Code 1975, § 25-5-57(a)(3). The trial court also determined that the worker’s second injury to her arm was not a compensable injury. The worker appeals, arguing that the effects of her injury extend beyond her arm, thus permitting an award in excess of the statutorily prescribed amount for an injury to the arm. See Bell v. Driskill, 282 Ala. 640, 213 So.2d 806 (1968). She also argues that her second injury was indeed a compensa-ble injury because her first injury “contribute[d] to [her second] ... injury.” See Erwin v. Harris, 474 So.2d 1125, 1127 (Ala.Civ.App.1985).
The review of this case is governed by the new Worker’s Compensation Act, which states in pertinent part: “In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” Ala.Code 1975, § 25-5-81(e)(2). Therefore, this court “will view the facts in the light most favorable to the findings of the trial court.” Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Industries, Inc., 680 So.2d 262, 269 (Ala.1996). Further, the trial court’s finding of fact is supported by substantial evidence if it is “supported by ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Trinity Industries, 680 So.2d at 268-69 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25 — 5—81(e)(1); see also Trinity Industries, 680 So.2d at 268.

Was the Worker’s Injury an Injury to a Scheduled Member?

The standard governing when compensation for an injury to a scheduled member is not limited to the amount specified by the statute was first defined by our supreme court in 1968. Bell v. Driskill, 282 Ala. 640, 646, 213 So.2d 806, 811 (1968). In Bell, the supreme court faced the same dilemma that is presented in this case: whether an injury to a scheduled member could be compensated for by an amount larger than the amount set by statute for that member. 282 Ala. at 645-46, 213 So.2d at 811. The worker in Bell had injured his foot or ankle on the job. 282 Ala. at 643, 213 So.2d at 809. After the injury, the worker continued to work for several months. 282 Ala. at 643, 213 So.2d at 809. He then had an operation on his knee. When he sued for compensation for his injury, the worker testified that he continued to have problems with his knee, from swelling at night to pain during his waking hours. 282 Ala. at 644, 213 Ala. at 809. The testimony also indicated that little improvement was expected. 282 Ala. at 644, 213 So.2d at 809.
The supreme court explained that, although the worker’s injury was to the knee, which would correspond to the leg, a scheduled member, the worker’s testimony and the court’s observation of the worker convinced the trial court that the worker had suffered more than an injury to the leg. 282 Ala. at 645, 213 So.2d at 810. The supreme court explained:
“[Ajlthough the injury itself- is to only one part or member of the body, if the effect of such injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under *1164 the Workmen’s Compensation Law to the amount allowed under the schedule for injury to the one member.”
282 Ala. at 646, 213 So.2d at 811. The Bell test has been paraphrased by this court to read as follows:
“[Wlhere the injury to one part of the body affects the other parts of the body and produces a greater or more prolonged incapacity than the specific injury would naturally produce, or causes an abnormal and unusual incapacity with respect to the member, an employee is not limited in his or her recovery to the amount allowed under the schedule for injury to one member.”
Checker’s Drive-In Restaurant v. Brock, 603 So.2d 1066, 1069 (Ala.Civ.App.1992).
This court recently applied the Bell test to a case in which the worker suffered an injury to both elbows. Cagle v. Dunlop Tire Corp., 681 So.2d 611 (Ala.Civ.App. 1996). As a result of his injury, the worker was instructed to do only limited grasping, to restrict repetitive movements, and to lift no more than 15 pounds with one arm or 30 pounds with both arms. Cagle, 681 So.2d at 612. The testimony revealed that the worker had lost much of the grip strength in both of his hands. Id. at 613. The trial court found that the worker had suffered an injury to scheduled members, id. at 612, but this court reversed, holding that the severe restrictions placed on the worker made his injury one that satisfied the requirements of Bell; that is, we concluded that the worker’s injury to his elbows produced more than the normal incapacity expected from that type of injury. Id. at 613, We also noted that this court had previously stated that “ ‘if the effects of an arm injury extend to the hand, then one is not limited to the scheduled benefits provided for the loss of an arm.’ ” Id. (quoting Robbins Tire & Rubber Co. v. Elliott, 598 So.2d 931, 933 (Ala.Civ.App. 1992)); see also United Technologies v. Mims, 549 So.2d 981, 982 (Ala.Civ.App. 1989).
In the present case, the worker testified that she wanted to return to her prior job as a master tire builder, but that she could not perform the job because the pain and tingling in her hand and arm worsened and because she did not have the strength in her wrist and hand to cut rubber as the job requires. The undisputed testimony in this case is that the injury to the worker’s forearm has resulted in pain, tingling, and numbness in her right hand, wrist, and forearm; reduced strength in her right wrist; reduced grip strength and reduced ability to do repetitive grasping in her right hand; and tingling, numbness, and stiffness in her right shoulder and her neck. Such symptoms, usually exacerbated by the worker’s use of her hand and arm, have been held to take an injury to a scheduled member outside the statute and permit an award based on the worker’s loss of ability to earn. See Elliott, 598 So.2d at 933; Mims, 549 So.2d at 982. Therefore, we conclude that that portion of the judgment of the trial court holding that the worker’s injury was to a scheduled member is not supported by substantial evidence and is reversed; the cause is remanded for entry of a judgment consistent with this opinion.
Was the Worker’s Second Injury a Compensable Injury ?
The trial court determined that the worker’s second injury, the fracture that resulted from a fall at home, was not a compensable, work-related injury. This court has held that “[a]n injury which occurs subsequent to an original, compensa-ble injury is itself compensable if it is the direct and natural result of the original, compensable injury.” Emin v. Harris, 474 So.2d 1125, 1127 (Ala.Civ.App.1985). The worker argues that the testimony of Dr. Horn establishes the necessary causal connection between the first injury and the second injury to entitle her to benefits for the second injury. After reviewing the undisputed testimony of Dr. Horn, we agree.
*1165 In Erwin, this court stated “that where a weakened member such as a leg contributes to a later fall or injury, such later fall or injury is a compensable consequence of the prior industrial injury.” Erwin, 474 So.2d at 1127 (quoting Carabetta v. Industrial Commission, 12 Ariz.App. 239, 469 P.2d 473 (1970)) (emphasis added). To recover benefits for her second injury, the worker must prove a causal connection between the first injury and the second injury. Id. The worker must prove that her weakened arm — caused by the first injury — contributed to her later injury— her second fracture.
In Benton v. Winn-Dixie Montgomery, Inc., 705 So.2d 495 (Ala.Civ.App.1997), this court applied the Erwin doctrine to a set of facts somewhat similar to those of this case. The worker in Benton suffered a herniated disk as a result of a work-related accident in 1989. Benton, 705 So.2d at 496. His injury was treated with several surgeries, including a posterolateral fusion. Id. In 1994, the worker was involved in an automobile accident. Id. The worker’s doctor discovered, after the automobile accident, a fracture in the fusion mass; this fracture was caused by a condition known as pseudoarthrosis, which prevented the fusion from adhering to the bone. Id. The doctor repaired the fracture with surgery in 1996, and the worker sought medical benefits for that surgery. Id. The trial court denied benefits, finding that the worker had failed to establish a causal connection between the 1996 back surgery and the 1989 work-related injury. Id. This court reversed, holding that the worker had indeed proven a causal connection between the 1989 injury and the 1996 surgery. Id. at 497.
In reaching our decision in Benton, we considered the testimony of the doctor, which revealed that the pseudoarthrosis that prevented the fusion from adhering to the bone was not a result of the trauma of the 1994 automobile accident. Id. The doctor stated that the fracture itself was caused by the trauma of the 1994 accident. Id. However, he opined that the cause of the 1996 surgery was a combination of the 1989 injury and the trauma of the 1994 accident. Id. He stated that, because of the 1989 injury, the worker’s back was in an unstable condition that made it more likely to fracture. Id.
In the present case, Dr. Horn testified that the original injury required reattachment of the bone fragments in the worker’s forearm with plates and screws. He explained that the bone under the plates and around the screw holes would remain soft. According to the doctor, the bone would slowly harden after the plates and screws were removed and that, typically, the hardening took place in about six weeks. When questioned about the worker’s second fracture, he stated that the fracture was through one of the screw holes in the bone and that the second fracture was a result of the weakness in the bone caused by the use of plates and screws to heal the first fracture. The doctor stated: “But I think looking at that X-ray that it was clear to me that the bone was weak at that point and [the fracture] went through [the screw hole]. So I think it is a combination of things, the fall plus the set-up based on the first accident.” He also stated that “[t]he first accident didn’t cause the fall, the first accident weakened the bone, the weak bone led to the fracture.... But I think that the weakened bone led to the second fracture, the weakened bone was from the first accident.”
Dr. Horn’s testimony is much like that of the doctor in Benton. He admits that the fracture itself was caused by the fall at the worker’s home. However, he states that the fracture was a result of the weakened bone caused by the not-yet-healed first fracture. Therefore, we conclude that the portion of the trial court’s judgment holding that the worker’s second injury was not compensable is not supported by substantial evidence and is reversed; the cause is remanded for entry of a judgment consistent with this opinion.
*1166 REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
THOMPSON, J., dissents.